[Cite as *State v. Brown*, 2025-Ohio-5716.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- vs -

TYREE RASHAD BROWN,

        Defendant-Appellant.

CASE NO. 2025-T-0010

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2024 CR 00941 A

## OPINION AND JUDGMENT ENTRY

Decided: December 22, 2025
Judgment: Affirmed

*Dennis Watkins*, Trumbull County Prosecutor, and *Charles L. Morrow*, Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481 (For Plaintiff-Appellee).

*Edward F. Borkowski, Jr.*, P.O. Box 609151, Cleveland, OH 44109 (For Defendant-Appellant).

EUGENE A. LUCCI, J.

{¶1} Appellant, Tyree Rashad Brown, appeals the judgment of conviction entered, after a jury trial, by the Trumbull County Court of Common Pleas, on one count of aggravated murder, with a firearm specification, and aggravated burglary, with a firearm specification. At issue is (1) whether the convictions are contrary to the weight of the evidence; (2) whether counsel was ineffective for failing to seek a bifurcation of the indicted count of weapons under disability; and (3) whether the trial court erred in denying Mr. Brown's motion for a mistrial where the prosecutor elicited evidence of his co-

defendant's guilty plea. We answer these questions in the negative and affirm the judgment.

{¶2} Mr. Brown was indicted on five counts: Count One: aggravated murder, an unspecified felony, in violation of R.C. 2903.01(A), with a firearm specification, pursuant to R.C. 2941.145; Count Two: aggravated murder, an unspecified felony, in violation of R.C. 2903.01(B), with a firearm specification, pursuant to R.C. 2941.145; Count Three: aggravated burglary, a felony of the first degree, in violation of R.C. 2911.11(A)(1), with a firearm specification, pursuant to R.C. 2941.145; Count Four: aggravated burglary, a felony of the first degree, in violation of R.C. 2911.11(A)(2), with a firearm specification, pursuant to R.C. 2941.145; and Count Five: having weapons while under disability, a felony of the third degree, in violation of R.C. 2923.13(A)(3).

{¶3} The case proceeded to a jury trial where the following evidence was established:

{¶4} On July 8, 2024, Michael Williamson ("Michael" or "co-defendant") and his sister, Amari Williamson ("Ms. Williamson"), had a disagreement which led to a physical altercation during which Michael punched her. Ms. Williamson was left with a black eye. When Ms. Williamson returned home to the apartment that she shared with her boyfriend, Kardell Lowery ("the victim"), the victim became agitated and was interested in fighting Michael.

{¶5} Ms. Williamson and the victim traveled to Michael's house where the two men fought. The victim won the fight, leaving Michael with a black eye, a "crooked jaw," and urine-soaked pants. Ms. Williamson thought the matter was over.

{¶6}     At approximately 6:00 a.m. on July 10, 2024, Ms. Williamson was asleep in the downstairs of her apartment. The victim and one of the couple's children, A.M., were asleep in the master bedroom. Ms. Williamson was awakened by a series of loud knocks at the back door. Thinking it may be the victim, she opened the door and was confronted by "two guys in black." She testified one had a mask and the other, appellant, Mr. Brown, did not.[1] Mr. Brown was wearing black clothing and gloves, and he wielded a "black gun in his hand with a long clip." Ms. Williamson testified she was "a hundred percent certain it was [Mr. Brown]" who entered with the firearm. Mr. Brown apparently looked directly at Ms. Williamson. Both men pushed past her without being invited and proceeded up the stairs to the second floor.

{¶7}     Ms. Williamson heard the victim shout, "not in front of my son" and another voice said, "something F you." Ms. Williamson grabbed her phone, ran to the front door, and heard two gunshots. Ms. Williamson ran to the apartment building across from her apartment. An individual answered the door, and Ms. Williamson advised the occupant of what occurred. Police were called, and Ms. Williamson notified the victim's grandmother of the events.

{¶8}     Shortly after she left the home, Ms. Williamson's eldest son, A.M., arrived at the apartment where Ms. Williamson retreated. He was scared and crying. He told Ms. Williamson that "Uncle Michael," the co-defendant, and "Uncle Tyree," appellant, had shot dad.[2]

---

1. Ms. Williamson testified she had "grew up" (sic) with Mr. Brown and both he and Michael had been to the apartment in the past.
2. Ms. Williamson stated that A.M. had known Mr. Brown "[a]ll his life."

Case No. 2025-T-0010

{¶9} At approximately 6:13 a.m., police received a call for "shots fired" and arrived at the scene within minutes. Officer Brian Martinek of the Warren Police Department was the first to arrive. He noticed that both the front and back doors of the residence were open. Officer Martinek entered the apartment, announcing his presence, but there was no response. He ascended the stairs and, upon entering the master bedroom, located the victim, lying face down in a large pool of blood, and, in his view, obviously deceased.

{¶10} A second officer accompanied Officer Martinek and located a small child in an adjacent bedroom, still asleep. The second officer secured the child and removed him from the crime scene.

{¶11} Officer Tim Ladner of the Warren Police Department also responded and assisted in securing the scene. Officer Ladner received information that one of the residents of the apartment complex heard shots, looked out his window, and observed two people, wearing blue gloves, jumping the fence which bounded the property. Officer Ladner drove to the adjacent property where the possible suspects were observed fleeing.

{¶12} Officer Ladner did not locate any individuals but found pieces of a blue latex glove in a grassy area between the relative properties. Photographs were taken of the area, and the remnants of the glove were processed as evidence. Prior to the incident, video surveillance demonstrated two people, dressed in black, wearing blue latex gloves running toward the apartment complex. One individual had white markings on his shoes and was carrying a handgun with an extended magazine.

Case No. 2025-T-0010

{¶13} Despite her eventual testimony that she was "a hundred percent" certain of Mr. Brown's identity, Ms. Williamson told one of the responding detectives that two *masked* men entered her home, and she did not know who they were. Ms. Williamson stated, however, she made this purportedly false statement because the intruders observed her and she worried they might attempt to harm her and/or her children.

{¶14} The glove pieces were later submitted to the Bureau of Criminal Investigation ("BCI"). Testing revealed the red/brown staining on the evidence tested "presumptive positive for blood." Further forensic testing of a swab from the glove remnants showed one of the blood stains contained DNA from the victim. Additional swabs from the glove showed a mixture containing both Mr. Brown's DNA on the inside of the glove and the victim's DNA on the outside of the glove.

{¶15} A .45-caliber casing, with the victim's blood on it, was found under his body. A stolen 9-millimeter handgun was recovered from a women's purse in the bedroom. A total of three projectiles were collected from the scene: a .45 caliber from the victim's head, and two .38 special or .357 magnum projectiles fired from the same revolver - one recovered from the victim's lower back and the other collected from the kitchen. The latter passed through the bedroom floor/kitchen ceiling and was in a bag of sugar. None of the recovered rounds were fired from the 9-millimeter recovered from the purse.

{¶16} Dr. George Sterbenz, a forensic pathologist and deputy coroner for Trumbull County, performed the autopsy on the victim. He determined the victim suffered two gunshot wounds – one to his lower back and one close-contact wound to the left side of his head. Dr. Sterbenz opined that the head shot would have been immediately fatal.

Case No. 2025-T-0010

{¶17} After BCI identified DNA profiles from the evidence submitted, the information was entered into "CODIS," a Combined DNA Index System. CODIS is a database utilized for connecting or matching DNA profiles. CODIS provided a preliminary association with unknown DNA from the crime scene to Mr. Brown.

{¶18} A warrant was obtained for Mr. Brown's home. During the search, officers collected a pair of black shoes, articles of black clothing, a black gun case, and a box of blue latex gloves. The black shoes had white soles which were consistent with the shoes worn by the individual carrying the firearm with an extended magazine captured in the surveillance video.

{¶19} Ricky Roupe was an inmate and former felon housed in the same Trumbull County jail-cell block as Mr. Brown. Mr. Brown spoke with Mr. Roupe while incarcerated where he apparently admitted he was being held on aggravated murder and aggravated robbery. The two men discussed the nature of DNA evidence. Mr. Roupe stated that his understanding of DNA was "just pretty much if it matches you, you're fucked."

{¶20} Mr. Brown allegedly told Mr. Roupe he had thrown gloves used in the crimes by a fence near the apartment. Mr. Brown indicated, however, his belief that any DNA on the gloves would have washed away because it had apparently rained.

{¶21} During direct examination, Mr. Roupe was asked if he was aware that Mr. Williamson, the co-defendant, had pleaded guilty to some of the charges. He responded in the affirmative. Defense counsel objected to the introduction of the co-defendant's plea, which the trial court sustained. On cross-examination, Mr. Roupe stated he was testifying with the hope of receiving a favorable sentence in his case.

Case No. 2025-T-0010

{¶22} The jury found Mr. Brown guilty on all counts and specifications. The matter proceeded to sentencing wherein the trial court merged Count Two with Count One for purposes of sentencing; the trial court also merged Count Three with Count Four for purposes of sentencing. The trial court ordered Mr. Brown to serve 30 years to life on Count One. The court ordered Mr. Brown to serve 10 to 15 years on Count Four and 24 months on Count Five. The trial court ordered Counts Four and Five to be served consecutively with Count One for an aggregate term of life imprisonment with the possibility of parole after 36 years.

{¶23} This timely appeal follows. Mr. Brown assigns three errors for this court's review. His first assignment of error provides:

{¶24} "Appellant's convictions were against the manifest weight of the evidence."

{¶25} Under this assignment of error, Mr. Brown concedes his defense was premised upon identity, and the State failed to persuasively establish he was responsible for the crimes of which he was convicted.

{¶26} The "[w]eight of the evidence concerns 'the inclination of the *greater amount of credible evidence* . . . to support one side of the issue rather than the other.'" (Emphasis in original.) *State v. Thompkins*, 1997-Ohio-52, ¶ 24, quoting *Black's Law Dictionary* (6th Ed. 1990). When considering challenges to the weight of the evidence, an appellate court reviews "'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [fact-finder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at ¶ 25, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "'The discretionary power to

Case No. 2025-T-0010

grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at ¶ 25, quoting *Martin* at 175.

{¶27} Moreover, "[t]he trier of fact is free to believe or disbelieve all or any of the testimony" and "is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible." (Citation omitted.) *State v. Haney*, 2013-Ohio-2823, ¶ 43 (11th Dist.).

{¶28} "'[A] determination of whether a conviction is or is not supported by the weight of the evidence "necessarily rests on the existence of sufficient evidence. . . .""" *State v. DiBiase*, 2012-Ohio-6125, ¶ 38 (11th Dist.), quoting *State v. Pesec*, 2007-Ohio-3846, ¶ 44 (11th Dist.), quoting *State v. McCrory*, 2006-Ohio-6348, ¶ 40 (11th Dist.). Consequently, if the weight of the evidence supports the conviction, it necessarily follows that the conviction is supported by sufficient evidence.

{¶29} Moreover, simply because the State's evidence could be deemed circumstantial does not mean the jury's verdicts are against the manifest weight of the evidence. "Circumstantial evidence and direct evidence inherently possess the same probative value . . . ." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus. Circumstantial evidence is defined as "testimony not grounded on actual personal knowledge or observation of the facts in controversy, but of other facts from which inferences are drawn, showing indirectly the facts sought to be established." *State v. Windle*, 2011-Ohio-4171, ¶ 34 (11th Dist.), citing *State v. Nicely*, 39 Ohio St.3d 147, 150 (1988). An inference is "'a conclusion which, by means of data founded upon common experience, natural reason draws from facts which are proven.'" *Windle* at ¶ 34, quoting *State v. Nevius*, 147 Ohio St. 263, 274 (1947). It consequently follows that "when

Case No. 2025-T-0010

circumstantial evidence forms the basis of a conviction, that evidence must prove collateral facts and circumstances, from which the existence of a primary fact may be rationally inferred according to common experience." *Windle* at ¶ 34.

{¶30} Appellant takes issue with the persuasiveness of the State's evidence in multiple respects. We shall address each contention in turn.

{¶31} First, Mr. Brown claims that Ms. Williamson's testimony was not credible because she initially stated that two masked men entered her home but later testified that Mr. Brown was not wearing a mask. We do not view this inconsistency problematic in relation to Ms. Williamson's explanation.

{¶32} At trial, Ms. Williamson admitted she initially lied to police regarding each assailant wearing a mask because she was "scared." She stated specifically "they actually seen that I seen and I got away. I thought something was going to happen to me and my children." (Sic.) Ms. Williamson additionally stated she is still afraid for herself and her children because, in her view, Mr. Brown or someone he knows could seek retribution against her.

{¶33} Ms. Williamson's concerns, as articulated, are not unusual or unreasonable. The jury could conclude that Ms. Williamson's initial fear of identifying Mr. Brown to police was reactionary and a product of her belief that she needed to protect herself and children from him or others. In other words, the jury could reasonably conclude that identifying Mr. Brown at the scene, before he was identified and caught, would cause Ms. Williamson significant worries about the safety of herself and her family.

{¶34} Next, Mr. Brown asserts that A.M.'s testimony was questionable because, even though he identified "Uncle Michael and Uncle Tyree" as the assailants, he also

Case No. 2025-T-0010

stated he ran out of the room *and then* heard gunshots. Mr. Brown claims that this purported sequence of events undermines A.M.'s knowledge and/or statements that Mr. Brown was involved in the shooting. We see no necessary contradiction in this evidence.

{¶35} There is no reason why A.M. could not identify Mr. Brown and his co-defendant as the suspects in the shooting *even if* he had already left the room. It stands to reason that, if A.M. identified the co-defendants and if one or both possessed firearms, the gunshots could be inferentially attributed to the co-defendants even if A.M. immediately fled the room. Human beings reliably engage in inductive reasoning every day. We acquire knowledge, in many instances, by generalizing from our experiences. As such, even if A.M. did not specifically witness the actual shooting, the surrounding factual circumstances inevitably and reliably supported his statement or conclusion relating to the shooting, i.e., that Mr. Brown and Michael were the shooters. We find no issue with the credibility of A.M.'s statement.

{¶36} Mr. Brown next takes issue with the DNA evidence offered by the State. He claims the fact that his DNA was found on the glove near the scene of the incident does not necessarily implicate him in the crime or even place him at the scene. Specifically, he claims that even if the glove was from the box confiscated from his home, DNA is transferable. Because DNA is transferable, the perpetrator could have taken gloves from his home without his knowledge, and his DNA could have inadvertently been transferred. By extension, Mr. Brown additionally notes that blue latex gloves are "readily available nearly anywhere" and cannot provide a credible basis for his involvement.

{¶37} While Mr. Brown creates foundations for doubt, the evidence cannot be viewed in a vacuum. The forensic evidence and its circumstantial ties to Mr. Brown cannot

Case No. 2025-T-0010

be ignored. Notwithstanding the *possibility* of DNA transfer, DNA analysis of the glove confirmed a mixture containing Mr. Brown's DNA on the inside of the glove and the victim's DNA on the outside of the glove. Moreover, it could be coincidental that the gloves, clothing, and shoes resembling those worn by one of the assailants were found in Mr. Brown's house. This evidence, although not dispositive, credibly ties Mr. Brown to the incident.

{¶38} Mr. Brown next takes issue with the testimony of Mr. Roupe, a fellow inmate in the Trumbull County Jail. He maintains Mr. Roupe had every reason to testify in a manner that would benefit him and the prosecution. Specifically, if he implicated Mr. Brown, he might garner a lighter sentence in his case. Mr. Brown therefore contends Mr. Roupe's testimony is not credible because he had a personal interest or stake in creating testimony in favor of the State's theory of the case.

{¶39} Mr. Roupe testified that Mr. Brown confessed to leaving the glove that was found at the scene. While Mr. Roupe's credibility is suspect, the jury heard that he was testifying for the State with the hope of receiving a favorable sentence. The jury weighed Mr. Roupe's substantive testimony against his obvious self-interest in providing that testimony. The jury was accordingly able to effectively consider the conflict, and therefore we vouchsafe such consideration deference.

{¶40} Finally, Mr. Brown claims that the surveillance videos provided little to no evidence implicating him in the crimes. He asserts the videos simply show two individuals dressed in black moving toward the apartment building. Moreover, he notes the fact that one individual was wearing shoes with "white markings" is of little consequence because such footwear patterns are relatively common. As a result, the evidence that shoes and

other items found in his home were consistent with shoes worn by one of the subjects in the video is of little evidential weight.

{¶41}  As noted above, the visual evidence of the subjects' clothing and shoes is not dispositive of Mr. Brown's guilt. Nevertheless, similar shoes, clothing, and a box of latex gloves were found in his home. This evidence, coupled with the video surveillance of the subjects approaching the apartment complex at the time of the murder, circumstantially connects Mr. Brown to the incident.

{¶42}  Contrary to Mr. Brown's contentions, the testimony of the witnesses and the evidence submitted was not unreasonable or impossible to believe, i.e., it was not manifestly untrue or contrary to experience. Any inconsistencies between the testimony of witnesses involve credibility issues that were resolved by the jury, and we accord great deference to the jury's credibility determinations. We must maintain appropriate deference to the jury's verdict by finding error *only when* the verdict is so against the great weight of the evidence as to be clearly wrong and/or unjust. Deference to the jury is particularly appropriate in cases that turn on the relative credibility of the witnesses since the appellate court does not have the benefit of watching the witnesses as they testify.

{¶43}  Considering our analysis of Mr. Brown's challenges, we conclude the verdict is not against the weight of the evidence.

{¶44}  Mr. Brown's first assignment of error lacks merit.

{¶45}  His second assignment of error provides:

{¶46}  "Was appellant's trial counsel ineffective for failing to seek bifurcation of the weapons under disability count, failing to request discovery, and failing to object to inadmissible prejudicial evidence?"

Case No. 2025-T-0010

{¶47} To prevail on a claim of ineffective assistance of counsel, "a defendant must prove that counsel's performance was deficient and that the defendant was prejudiced by counsel's deficient performance." *State v. Davis*, 2020-Ohio-309, ¶ 10, citing *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989); and *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Thus, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Davis* at ¶ 10, citing *Bradley* at paragraphs two and three of the syllabus.

{¶48} Under his second assignment of error, Mr. Brown argues he received ineffective assistance of counsel because trial counsel failed to seek bifurcation of the weapons under disability charge, which included proving a prior drug conviction. He also maintains the introduction of the prior drug conviction was an inflammatory fact that incited the jury to convict him based on past misconduct. Mr. Brown additionally argues counsel was ineffective for failing to object to testimony of a deputy who stated Mr. Brown threatened Mr. Roupe outside the courtroom.

{¶49} In this case, Mr. Brown's defense was he was not present at the scene when the murder took place. A primary question the jury resolved in convicting Mr. Brown of the underlying murder was his identity as the shooter. As discussed above, and in the context of the greater evidentiary tableau, the State presented direct and significant circumstantial evidence to support its theory of the case. As a result, it presented sufficient evidence consistent with the manifest weight of the evidence.

{¶50} Mr. Brown fails to explain how, in light of all of the other evidence introduced at trial, the result of his trial would have been any different had his weapons under

Case No. 2025-T-0010

disability count been tried separately. The fact that his attorney did not seek to bifurcate his weapons under disability count from the remaining counts does not constitute per se ineffective assistance of counsel.

{¶51} That said, we recognize that trial counsel would not have acted unreasonably in seeking a bifurcation of the weapons under disability charge. This, however, does not necessarily imply his representation was deficient or otherwise unreasonable for not doing so. Identity was Mr. Brown's defense – such a defense is an all or nothing defense to the charges. In this regard, counsel could have determined that if the jury did not believe the State's evidence, Mr. Brown would be acquitted of *all* charges, including the weapons under disability charge.

{¶52} Considering these points, counsel's failure to seek bifurcation can be viewed as debatable, yet reasonable trial strategy. An attorney's decisions not to file certain pretrial motions, including a motion to sever charges for separate trials are "'debatable trial tactics [that] generally do not constitute a deprivation of effective counsel.'" *State v. Aaron,* 2003-Ohio-5159, ¶ 23; quoting *State v. Phillips,* 1995-Ohio-171, ¶ 40.

{¶53} Furthermore, the trial court provided a curative instruction explaining the nature of the evidence introduced and emphasizing its limited purpose. The trial court stated:

> Evidence was received that the defendant was convicted of felony possession of cocaine. That evidence was received because a prior conviction is an element of the offense charged. It was not received, and you must not consider it, to prove the character of the defendant in order to show that he acted in conformity with that character.

Case No. 2025-T-0010

{¶54}   It is well settled that a jury is presumed to follow the curative instructions of a trial court. *State v. Loza*, 71 Ohio St.3d 61, 75 (1994).

{¶55}   Given the debatable nature of trial counsel's decision not to seek bifurcation, in conjunction with the evidence submitted at trial, as well as the trial court's curative instruction, we hold trial counsel's performance was neither deficient nor was Mr. Brown prejudiced.

{¶56}   Next, Mr. Brown argues that counsel was ineffective because he did not request discovery. We disagree.

{¶57}   During a January 8, 2025 pretrial hearing, the following exchange took place between the prosecutor and defense counsel:

> [Prosecutor]: Discovery has been substantially provided. I spoke with [defense counsel] today. I know he purposely doesn't file for a discovery because of savvy lawyers like him. No more discovery will be given until he makes a formal request. Once that is done, we'll make sure any additional discovery is timely provided.
>
> . . .
>
> [Defense counsel]: I have received some discovery in this case. If I need additional discovery, which in Mr. Williamson's case, I think [the prosecutor] did indicate that he has all of the discovery ready when that pretrial occurred moments ago. But if there is anything additional that I need that I can't obtain, then I will file it with [the prosecutor] and ask for it.

{¶58}   At a subsequent pretrial, the prosecutor reiterated that defense counsel had still not filed a motion for discovery. The following exchange took place at a final pretrial:

> [Prosecutor]: . . . [Defense counsel] has not filed for discovery and I know that sometimes it's his practice. I won't speak for him. I know he's a competent and savvy defense lawyer but I'm worried an appellate court looking at a cold record may not have the same understanding that I do. Initially, I provide an informal discovery packet to all lawyers and I did that in this

case, which represents about 90 percent of the discovery in this case. So I know that he has that. But that being said, there are things that I am certain will be admitted at trial that [defense counsel] doesn't have in this case. So I just would ask the Court, you know, he hasn't filed a demand so I'm under no obligation. I filed a witness list, I filed discovery, a complete packet with a detailed list in the companion case which is under the same case number only 941-B, and I just ask the Court to inquire just in case we get to the Court of Appeals someday, I would just like there to be some record of, you know, why that wasn't done in this case.

. . .

The Court: Okay. Well, I don't think it's about the State's appeal. What it's about is if Mr. Brown is found guilty and is sentenced, then his appeal it could come up and go before the Court of Appeals and the record would be devoid of any request for discovery on your part, which would indicate that you would be potentially [accused of] ineffective assistance of counsel. And so for that reason, I think [the prosecutor] is wise in putting this on the record.

[Defense counsel]: I understand that. I believe - - and first of all, I represented to the Court that I am ready to go to trial; that I believe that I have through whatever means that I have at my disposal been able to ascertain all of the relevant evidence in this case. I have fully discussed those matters with my client as well as the strategy that I have employed in my approach to this case and will continue to employ. I see [the prosecutor] - - and I'm not casting aspersion here because he is as well a crafty and savvy lawyer. *I think that this is a somewhat of a fishing expedition on his part to try and ascertain what my strategies might be and my approach might be with respect to the trial of this case. And so I'm not going to lay out a road map as to why this is, you know, reasons as to [why] I have done this or not done that and here's the reason why and here's my strategy.* We're not going to do this at this time.

The Court: And that's fine . . .

[Defense counsel]: I am satisfied we're ready to go to trial.

The Court: Okay. And, [defense counsel] just the only thing that I want on the record is this is a strategic decision that you've made on your part on behalf of your client

Case No. 2025-T-0010

[Defense counsel]: It is. *And as the court is aware, there are countless appellate decisions which recognize that, you know, filing a demand for discovery or not filing a demand for discovery, is a strategic decision by defense counsel.*

(Emphasis added.)

{¶59} The record demonstrates defense counsel made a reasoned strategic decision not to file a motion for discovery. He justified his position on record. Mr. Brown's defense in this case was identity and/or lack of involvement. Defense counsel provided a reasonable and careful defense against the State's case. We cannot find counsel's decision to seek additional discovery he did not possess problematic. We therefore conclude trial counsel cannot be deemed ineffective for his strategic decision.

{¶60} Next, Mr. Brown asserts counsel was ineffective for failing to object to the testimony of Deputy Dan Peterson. Deputy Peterson transported Mr. Brown from the jail to the courthouse during trial. During the transport, Mr. Brown encountered Mr. Roupe and stated, "Hey, Roupe, I'm going to make sure you get fucked up in prison for lying on me." Mr. Brown asserted this testimony was irrelevant to the charges and was injected into the proceedings simply to paint him as a "bad guy" on unrelated "bad acts."

{¶61} While Mr. Brown's point is appreciated, defense counsel, on cross-examination immediately asked the deputy, "If somebody accused you of a murder that you didn't commit, that would kind of tick you off, wouldn't it?" The deputy responded, "It could." In light of counsel's question, we fail to see how his failure to object caused Mr. Brown prejudice.

{¶62} Finally, Mr. Brown asserts certain "other issues" as a basis for his claim that counsel was ineffective. First, Mr. Brown notes that trial counsel, during opening, stated

he "had a case about a year before, he's on probation for it." Mr. Brown claims counsel was deficient to his prejudice for mentioning this point.

{¶63} In the context of counsel's opening, it is clear that counsel was pointing out that the police heard his name, which was unreliable, in his view, and then worked backwards because they knew his name from a prior case. In effect, counsel attempted to impugn the investigation by injecting a suggestion of police prejudice. We discern no deficiency.

{¶64} Moreover, Mr. Brown was not prejudiced by counsel's opening statement because, during jury instructions, the trial court advised the jury that the evidence does not include opening or closing statements. As noted above, a jury is presumed to follow a trial court's instructions. *Loza*, 71 Ohio St.3d at 75.

{¶65} Next, Mr. Brown claims that counsel did not, during cross-examination, focus on Ms. Williamson's changed story regarding "when" she first "heard" Mr. Brown was involved in the incident.

{¶66} It is somewhat unclear what Mr. Brown suggests regarding counsel's alleged ineffectiveness, but apparently Ms. Williamson was not immediately forthcoming about her knowledge of Mr. Brown's involvement. This issue was touched upon under Mr. Brown's first assignment of error, i.e., Ms. Williamson's failure to identify Mr. Brown at the scene and her "sandbagging" on this point before trial.

{¶67} Even though counsel did not aggressively pursue this point on cross-examination of Ms. Williamson, counsel's omission can be reasonably viewed as trial strategy. After all, she had testified on direct that she observed a "mask-less" Mr. Brown enter her home; she heard gunshots; she then encountered A.M. who, according to Ms.

Case No. 2025-T-0010

Williamson, exclaimed "Uncle Mike" and "Uncle Tyree" shot dad. Defense counsel could have concluded that pressing Ms. Williamson beyond these details may be an unfavorable strategy in front of the jury. Counsel was not ineffective for not pursuing an additional line of questioning on these points.

{¶68} We discern no deficiencies or prejudice in trial counsel's performance.

{¶69} Mr. Brown's second assignment of error lacks merit.

{¶70} For his third assigned error, Mr. Brown asserts:

{¶71} "The trial court erred by denying appellant's motion for a mistrial."

{¶72} Under his final assignment of error, Mr. Brown contends the State's elicitation of testimony from Mr. Roupe that he was aware of the co-defendant's guilty plea was a sufficient basis to grant a mistrial. Specifically, Mr. Brown argues that no cautionary instruction from the trial court could undo the damage. In Mr. Brown's view, evidence of his co-defendant's guilt implied that he must be guilty as well.

{¶73} "The grant or denial of a mistrial lies within the sound discretion of the trial court." *State v. Trimble,* 2009-Ohio-2961, ¶ 173. "However, a trial court need not declare a mistrial unless 'the ends of justice so require and a fair trial is no longer possible.'" *Id*., citing *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991).

{¶74} At trial, the prosecutor asked Mr. Roupe if he was aware that the co-defendant pleaded guilty to some of these charges. Defense counsel objected. The following exchange provides context to Mr. Brown's assignment of error:

> [Defense counsel]: Your Honor, I object to the prosecutor seeking to introduce the guilty plea of the co-defendant. I believe that's highly improper. I believe it is grounds for a mistrial. . . .
>
> . . .

[Defense counsel]: . . . I'm a little taken aback by this because I - - it's not what I expected from the prosecution here. Suffice it to say that, I believe it is highly improper and, in fact, prohibited for the prosecution to introduce the co-defendant's guilty plea.

[Prosecutor]: [Defense counsel's] the one who put this in front of the jury. He said that he's the one that actually killed these people and all of these things. You know, he has him listed on his witness list. It's my understanding that he's going to call him. At either rate, my intention is not to delve into any of that in any capacity, just to delve into some additional statements made by Mr. Brown after that hearing. That was the only reason to even - - just for a frame of reference in time. So I will quickly move on.

{¶75} The trial court sustained defense counsel's objection and stated it would provide the jury with a curative instruction. Defense counsel observed that he did not think a curative instruction "can put the toothpaste back into the tube on this issue."

{¶76} The prosecutor continued examination of Mr. Roupe and again elicited testimony that the co-defendant "took a deal." Defense counsel again objected on the same basis, and the trial court again sustained the objection. The trial court underscored that the jury would be advised to disregard the statements. No mistrial was ordered.

{¶77} During jury instructions, the trial court directed:

Statements or answers that were stricken by the Court or which you were instructed to disregard are not evidence and must be treated as though you never heard them. You must not speculate as to why the Court sustained the objection to any question or what the answer to such question might have been. You must not draw any inference or speculate upon the truth of any suggestion included in a question that was not answered.

{¶78} The court further advised the jury:

A statement was made regarding the status of a co-defendant's case. This statement must be disregarded by you

Case No. 2025-T-0010

and not considered for any purpose. The co-defendant's criminal case is a separate and distinct matter from this case. The procedure in a separate criminal case is not relevant to this case in any way. As the Court previously instructed you at the time the statement was made, the status of the co-defendant's case is not relevant in any way to the guilt or innocence of this defendant. The guilt or innocence of this defendant must be determined by you solely based upon the evidence introduced in the trial of this case.

{¶79} Although Mr. Brown contends the alleged improper testimony regarding the co-defendant's guilty plea was inherently prejudicial, and we appreciate the concern advanced, we fail to see *how* the testimony harmed Mr. Brown's defense. Mr. Brown essentially claimed he was not present during the murder. Simply because his co-defendant entered a plea does not change his exhortation to the jury that he was not involved. It is uncontroverted that two individuals were involved in the incident. The statement regarding the co-defendant's guilty plea did not change this fact and did not specifically implicate Mr. Brown.

{¶80} We agree the information relating to the co-defendant's guilty plea was properly excluded. We also conclude the trial court's curative instruction was sufficient to remove the information from the jury's deliberation. Although we understand, as defense counsel stated, proverbial toothpaste could not be placed back in the tube, any effect the information had on the jury did not redound to Mr. Brown's prejudice. That is, his defense is consistent with the co-defendant pleading guilty in the face of his prosecution and protestation of innocence.

{¶81} The trial court did not abuse its discretion in denying the motion for mistrial.

{¶82} Mr. Brown's third assignment of error lacks merit.

{¶83} For the reasons discussed in this opinion, the trial court's judgment is affirmed.


MATT LYNCH, J.,

JOHN J. EKLUND, J.,

concur.

Case No. 2025-T-0010

## JUDGMENT ENTRY

For the reasons stated in the opinion of this court, appellant's assignments of error lack merit. It is the judgment and order of this court that the judgment of the Trumbull County Court of Common Pleas is affirmed.

Costs to be taxed against appellant.

_____
JUDGE EUGENE A. LUCCI

_____
JUDGE MATT LYNCH,
concurs

_____
JUDGE JOHN J. EKLUND,
concurs

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

Case No. 2025-T-0010